## INNMAN & ALS. *vs.* JACKSON.

A devise of lands to an executor, to be sold for the payment of debts and legacies, with power to give deeds in fee, is a conveyance of the legal estate to him in fee and in trust.

It seems unnecessary that deeds made by proprietors' committees, and persons acting *in auter droit*, other than executive officers, should contain recitals of their authority and proceedings in the sale ; as their certificates of such proceedings are not in themselves evidence of the facts they recite.

Whether the proprietors of land granted by the State, but not yet located in any particular county or place, can, prior to such location, act as a corporation under a warrant from a Justice of the peace, pursuant to *Stat.* 1783, *ch.* 39, and *Stat.* 1821, *ch.* 43 ;—*quære.*

The forty days' notice required by the Provincial act of 1753, *Ancient Charters, ch.* 253, and the sixty days' similar notice required by the act of 1762, *Ancient Charters, ch.* 289, to be given previous to the sale of delinquent proprietors' lands, are to be computed after the expiration of the respective periods of three, six, and twelve months, mentioned in those statutes.

THIS was a writ of entry for certain lots of land in *Paris*, in which the demandants counted on the seisin of *George Innman*, their father, within forty years. · It was tried before the Chief Justice, upon the general issue, at *August* term 1824.    Since the commencement of the action, but prior to the term next before the trial, *Mary Ann R. Innman*, one of the demandants, had been married ; and this fact was suggested by the tenant, and entered on the docket at the term at which the cause was tried.

The demandants, in support of their title, read to the jury a copy of a grant from Massachusetts, to *Joshua Fuller, William Park, William Dana*, and others, of· a tract of land six and a quarter miles square, bearing date *June* 11, 1771 ; and a confirmation of the same grant by boundaries, including what is now the town of *Paris*, as corrected and finally established by a resolve of *Feb.* 11, 1773.    It appeared that the original records of the proprietors of *Paris*, and their original plan of the township, had long been lost ; but that the lots demanded were marked on the plan with the name of " *R. Innman* ;" that they were commonly called the *Innman lots* ; and that the tenant had so designated them.

The demandants also offered a copy of a deed, dated *Aug.* 5, 1773, from *Alexander Sheppard, Josiah Bisco,* and *Josiah Brown,* as a committee of the proprietors of *Paris,* "to make sale of, and deeds of conveyance to execute, of such of the proprietors' rights in said township as are delinquent in the payment of the taxes that have been granted by said proprietors;" in which they profess, in that capacity to sell and convey to *Ralph Innman* and his heirs, two full rights or sixty fourth parts of the township, being the rights granted to *William Park* on the right of *Richard Park,* and to *James Hay* on the right of *Richard Coolidge*; reserving the right of redemption as provided in an act of the Province; on condition that the grantee should perform the conditions mentioned in the grant of the township;—and covenanting that they were lawfully authorized to sell and convey said rights to him to hold as aforesaid.

They also offered a copy of another deed, of the same date, and in the same form, in which the same committee professed to convey to *Alexander Sheppard, jun.* the right, or sixty fourth part of the lands in said town, which was granted to *William Dana.* These two copies were objected to by the tenant, but the Judge admitted them to be read. The demandants also read a deed from *Alexander Sheppard, jun.* to *Ralph Innman,* conveying to him the right last mentioned. Proof of their pedigree being then called for, they produced the deposition of *Andrew Brimmer,* who testified that *Ralph Innman* had two children, *George* and *Susan*; that the former left this country at the commencement of the revolution, married at the south, and resided abroad till his death; after which, in the autumn of 1788, his widow and four children, who are the present demandants, returned to Massachusetts;—and that *Susan* was married abroad, and reputed to have had children. The tenant hereupon objected that the demandants, upon this evidence, were not entitled to demand the whole estate, but only a moiety in common with the heirs of their father's sister;—to remove which objection the demandants were permitted to read a copy of the last will of *Ralph Innman,* their grandfather, containing several pecuniary legacies, and the following items :—

" I give and devise to my executor all my real estate in *Cambridge* or elsewhere, to be sold as soon as is convenient after my decease; and I hereby give him full power and authority to make sufficient deeds of sale in fee simple of my said estates.— I further will, order, give, and devise so much of the money as my said estates shall sell for, after payment of my debts and legacies, to my son *George Innman*, and in case of his death, to the person or persons who shall, by the laws of England, legally represent him.—I give and devise all the residue of my estate, of every kind, to my said son *George*, and his heirs, and in case of his death, to the person or persons who shall legally represent him, by the laws of England." Of this will, which was executed *May* 5, and proved *July* 18, 1788, he appointed *Herman Brimmer* the executor.

The effect of this evidence, as establishing the title of the demandants, the Chief Justice reserved for the consideration of the court; and a verdict was returned for the demandants, subject to the decision of the court upon the points reserved.

*N. Emery* and *Greenleaf*, for the tenant, at the argument, which was in *August* term 1825, maintained the following positions.

1. The intermarriage of one of the demandants is a fact which, being suggested on the record, abates the writ as to her. This suggestion, like that of the death of a party, may be made whenever the fact is known, at any time before verdict. And being seasonably made, the verdict ought now to be set aside, that the writ may be amended, and a new trial had for the residue of the land, pursuant to *Stat.* 1822, *ch.* 186.

2. The deeds of *Aug.* 5, 1773, by *Sheppard* and others, are of no validity. 1st—Because they do not purport to be the deeds of the proprietors, but of their committee, who were not public officers, but private agents, and therefore should have acted in the name of their principals, and not in their own names. *Fowler v. Shearer* 7 *Mass.* 14. *Stenchfield v. Little* 1 *Greenl.* 231. 2d—Because they do not set forth or affirm the performance of any act made necessary by the statute, in order to effect a good sale. Every deed, return, or other charter of title by involun-

Innman & als. *v.* Jackson.

tary conveyance, ought to contain in itself a recital of every thing which is made essential in the title by the statute under which the sale is made. But these deeds mention no advertisement of the tax, nor notice of the sale, nor actual sale by auction, nor that a sale of so much was necessary, to defray the taxes and charges. *Davis v. Maynard* 9 *Mass.* 242. *Wellington v. Gale* 13 *Mass.* 488. *Howe v. Starkweather* 17 *Mass.* 243. *Stead's Ex'rs. v. Course* 4 *Cranch* 414. 3d—Because they were made without any authority. The sales were bad, if made under the statute of 1753, *sec.* 2, *Ancient Char. p.* 599, being made within six months after the confirmation of the grant, *Feb.* 11, 1773, and consequently within six months after the assessment of the tax. But this section of that statute is virtually repealed by that of 1762, *Ancient Char. p.* 645, which is a deliberate expression of the will of the legislature upon the whole subject matter of the former act; and requires all future sales to be made by the assessors, who are sworn officers, instead of being made by committees, who are not under oath. *Bartlett v. King* 12 *Mass.* 545. *Towle v. Marrett* 3 *Greenl.* 22. *Ellis v. Paige & al.* 1 *Pick.* 45. *Slade v. Drake* Hob. 298.

3. But if the deeds were good, the copies were improperly admitted, the action being by heirs at law, claiming under deeds made to their ancestor. In such cases copies cannot be used, until a foundation is laid for the introduction of secondary evidence, by first accounting for the non-production of the original. *Cunningham v. Tracy* 1 *Connecticut Rep.* 252. 2 *Day* 227. 3 *Day* 264. *Swift's Ev.* 4.

4. By the demandants' own shewing, in the will and deposition, they can have no title to the land. It was devised to *Herman Brimmer*, the executor, in trust, and has descended to his heirs. *George Innman* was entitled to receive only the money to be raised by sales of the land, after payment of the debts and legacies. He was a refugee; and it was doubtful, when the will was made, whether persons in his situation would be permitted to hold lands here. His father therefore evidently intended to devise them legally to *Brimmer*; changing the benefit intended for his son, into a legacy strictly pecuniary. It was not a

precautionary devise, to sell for the payment of debts, or to meet contingencies ; but was an absolute disposition of the whole estate. And this legal estate in the executor, even a stranger may set up, in defence of his own possession. *Craig v. Leslie* 3 *Wheat.* 563. *Doe v. Richards* 3 *D. & E.* 356. *Co. Lit.* 112, 113, 236. *Doe v. Staples* 2 *D. & E.* 684. *Shep. Touchst.* 448— 450.

*Longfellow* and *Fessenden*, for the demandants, replied to the first objection, that no advantage of the intermarriage of one of them pending the suit, could be taken in any method but by plea in abatement ; and that this must be pleaded at the term next succeeding the event. 1 *Bac. Abr. tit. Abatement* G.

2. The deeds were well executed in the names of the committee, since the statute expressly authorizes *them* to give deeds. The cases relating to agent and principal do not apply to this. Neither was it necessary to recite the authority, nor the proceedings of the committee in making the sale. Such recitals are deemed necessary only in sales by sheriffs, whose returns are under oath, and are conclusive evidence of the facts therein stated. And the sale was rightly made by the committee, instead of the assessors, the statute of 1753 being in force, till revised by *Stat.* 1783, *ch.* 39. *Bott v. Perley* 11 *Mass.* 175. The former act authorized the levying of taxes on each proprietor's several right. The statute of 1762 did not repeal this, but conferred the additional power to assess any common and undivided lands of the proprietors, *in solido* ; taxing them as a corporation, and not as owning individual shares ; as in *Pejepscot Proprietors v. Ransom* 14 *Mass.* 145, where a tract of 1700 acres was taxed as proprietors' land. The latter statute contains no repealing clause; it is not enacted *in pari materia* ; and by contemporaneous exposition, both statutes have been taken as equally in force, until the former was revised in 1783. It was the act of 1753, and not that of 1762, which the legislature ordered to be printed in the appendix to the revised edition of the laws of Massachusetts. Nor can the objection arising from the lapse of six months after the confirmation avail the tenant, since the grant takes effect

from its date, and not from the time when it was confirmed.    It is as if one should grant to another twenty acres of land, to be taken wherever the grantee may choose to locate it.    Here no new deed is necessary ; but whatever parcel the grantee may designate by metes and bounds, is his own, by force of the deed.

3. The copies of the deeds were properly admitted.    Had the originals been produced, being more than thirty years old, they would have been read of course, without proof of their execution. By the common law of England, title deeds descend, as heir looms, with the inheritance ; 4 *Cruise's Dig.* 59 ; and hence the propriety of requiring the heir to produce them in proof of his title.    But the reason ceases here, where the lands descend to all, in equal portions ; and no one having an exclusive right to the soil, no one can claim possession of the deeds.    They go, with all other papers, to the executor, who may sell the lands for payment of the debts ; and may have trover for title deeds, even against the heir.    *Towle v. Lovitt* 6 *Mass.* 394.

4. To the objection that no estate passed to *George Innman* by the will ; they replied that by the language of the devise, the executor took only an authority, coupled with an interest ; and not a fee descendible to his heirs.    *Powell on Devises,* 198.    *Co. Lit.* 113, *a. note* [2.] *ib.* 181 *b.* 236 *b. Shep. Touchst.* 448, 449. He must sell in convenient time, or the heir may enter, and put him out.    *Lit. sec.* 383, *note* [146.]    2 *Roberts on Wills, app.* 5 *note* 4.    *Swan v. Lewis* 14 *Mass.* 83.    After the purpose of the devise to him is satisfied, the lands go to the heir, as a resulting trust, or to the residuary devisee.    9 *Mod.* 122. 4 *Dane's Abr. ch.* 114, *art.* 8.    The fact that the real estate was not sold by the executors, shews that the personal estate was sufficient of itself to pay the debts and legacies.    *Jackson ex dem. Ellsworth v. Jansen* 6 *Johns.* 72.    After this lapse of time, an entry on the executor may be presumed ;    *Smith v. Stewart* 6 *Johns* 34.    2 *Caines* 382. 17 *Mass.* 74.    8 *Cranch* 249 ;—or even a conveyance from him to the *cestui que trust.*    1 *Cruise's Dig.* 492.    3 *Burr.* 1901. *Doug.* 721.    2 *Johns* 226.    13 *Johns* 516.    12 *Ves.* 239.

But this objection is not open to the tenant, because he does not claim under the legal estate, thus attempted to be set up against

the equitable title of the demandants. *Newhall v. Wheeler* 7 *Mass.* 189.

After this argument, the cause having been continued for advisement, the opinion of the court was delivered at the *September* term in this year, at *Wiscasset,* by

MELLEN C. J.    In the argument of this cause several objections have been made and urged against the title of the demandants. as disclosed by the report of the judge who presided at the trial.    On all these, on both sides, the arguments have been able, and we have listened to them with attention and examined them with care.    Passing over some of the points, as not of sufficient importance to require particular notice, we have placed our decision on a number of distinct grounds, which seemed to demand our consideration ; and we now proceed to a statement of those facts and principles of law which have conducted us to that conclusion and judgment which must settle the rights of the parties in this suit.

The demandants have counted on the seisin of *George Innman,* their father ; and they demand the whole of the premises described.    But as it appeared by the deposition of *Andrew Brimmer,* which was introduced by the demandants to prove their pedigree, that they were not entitled to the whole, but only to an undivided proportion of the demanded premises ; inasmuch as their father *George Innman* was not the only child and heir of *Ralph Innman* ; they then introduced the will of *Ralph Innman,* to prove that all his real estate was devised to *George Innman,* his son ; and this will, thus introduced, must be considered by us as forming a part of the case, and have its legal operation accordingly.

It is essential to the maintenance of this action, at least, in its present form, that the seisin of *George Innman* should be proved, as alleged in the writ ; or a seisin of an undivided proportion of the premises demanded.    If we lay the will, as to the effects of the devise therein contained, out of the case, and inquire whether *George Innman* was seised of a proportion of the estate as heir

of his father *Ralph Innman*, the report shews us no satisfactory proof of such seisin. The will bears date *May* 5, 1788 ; and the probate of it bears date *July* 18, 1788 ; of course the testator must have died sometime between those two days or dates ; and *Brimmer* in his deposition swears that the widow of *George Innman*, with her children, arrived in this country from England, in the autumn of 1788. From these facts it does not by any means appear that *George Innman* was living at the time of his father's decease ; on the contrary the presumption is that he was not; as we find his widow was in this country in the autumn. If *George* was dead at the time of his father's death, then no seisin whatever on his part is proved ; but as the fact is not reduced to a certainty, we are not at liberty to consider the presumption as a proper ground of decision upon this point ; and we therefore proceed to examine the demandant's title in another point of view.

As we have before observed, the will of *Ralph Innman* has been offered in evidence by the demandants, as a part of the case ; and its operation and effect are therefore to be considered, in connection with other facts, in forming our opinion ; and if they have, by their own evidence, shewn that the legal estate in the lands demanded was never vested in *George Innman*, it follows that no legal right has descended to the demandants, to entitle them to maintain this action. The inquiry then is, what is the true construction of *Ralph Innman's* will, in respect to the devise of his real estate. The words are—"I give and devise to my " executor, all my real estate in *Cambridge* and elsewhere, to " be sold as soon as is convenient after my decease ; and I here- " by give him full power and authority to make sufficient deeds " of sale in fee simple of said estates." The testator then directs his debts to be paid out of the proceeds of the sale ; and in express words devises, not the land, but the money his estate should sell for, to *George*, and, in case of his death, to the person or persons who should, by the laws of England, legally represent them ; and appointed *Herman Brimmer* his sole executor.

A devise to trustees for payment of debts or for other purposes, passes the legal estate to the trustees. So a devise to executors to sell and pay debts, passes the legal estate to them in trust.

This is the general principle. It is a power coupled with an interest. A conveyance or devise in trust cannot be construed as a conveyance or devise to use, where it is repugnant to the manifest intention of the person conveying or devising. These principles are established or recognized by the following cases and authorities, as well as many others. 1 *Dane's Abr.* 244, 246, 247. Judge *Trowbridge's Reading* 3 *Mass.* 673. *Newhall v. Wheeler* 7 *Mass.* 189. *Goodwin v. Hubbard* 15 *Mass.* 219. *Somes v. Skinner* 16 *Mass.* 356. *Craig v. Leslie* 3 *Wheat.* 563.

In the case at bar, the intent of the devisor, and the language of the will, cannot be satisfied, according to decided cases, but by construing the devise to the executor as conveying the legal estate in fee to him in trust. He was to sell the estate and give deeds in fee simple; and convert the real estate into personal. Thus by the devise the legal estate was vested in *Herman Brimmer*, as trustee for the creditors of the testator, and for *George Innman*, or his children; and nothing more ever vested in them than the equitable estate. If no sale of the estate was ever made by the executor, then the legal estate has descended to his heirs ; being governed by the same rules as other legal estates. 1 *P. Wms.* 108. 1 *Ves.* 357. 1 *Cruise* 492, 493. If a sale has been made, then the fee or legal estate was passed to the purchaser, and never vested in *George Innman* ; and if out of the proceeds of such sale the debts have been paid, and the *residuum* has never been paid over to *George* or the demandants, still such *residuum* cannot be recovered in a real action.

Can we, from lapse of time, presume a conveyance of the legal estate from *Brimmer*, the executor and trustee, to *George Innman* ; and thus find proof of his seisin ? The report furnishes no facts whatever as to the proceedings of the executor under the will. We know nothing of the testator's debts, or whether he owed any; or whether the executor ever sold any part of the estate. If we indulge in presumption, it would be rational to presume that the executor did his duty, by complying with the directions of the will; and this surely would furnish no proof of any seisin of *George Innman.* We ought not to presume that the executor violated his duty, and without making any sale, convey-

ed to *George Innman*, the *cestui que trust*, the whole of the estate; and, besides, when could this conveyance have been made ? *George* died in England, and probably before the will was proved, or even executed. All ground of presumption, therefore, fails, which could be favorable to the demandants. One general answer has been, by their counsel, given to the objection of the tenant, founded on the devise to *Brimmer*, of the legal fee simple estate, claimed in this action by the demandants, as children and heirs of *George Innman* and grandchildren of *Ralph Innman*; which is, that as the tenants are strangers to the title, it is not competent for them to make this objection. And among other cases the counsel has, to this point, cited and relied upon the case of *Newhall v. Wheeler* 7 *Mass.* 189; in which *Parsons* C. J. in delivering the opinion of the court, says, " No person " can set up the legal estate against the equitable estate, but " the trustees, or some person claiming under them;" and then, after having stated the seisin and possession which the demandant had proved, under the *cestui que trust*, he proceeds and says, —" for the actual possession is *prima facie* evidence of a legal " seisin; and a stranger to the trust shall not be permitted to " control this evidence, by proving the existence of the trust " estate." The first reply to this argument, and this authority, is, that the demandants in the case at bar, have never had any actual possession. But the principal and decisive answer which we have noticed before, is, that the tenant has not proved and set up the legal estate against the equitable estate. The demandants have themselves established those facts which shew that they have no title to recover. If a plaintiff, in his declaration, shews that he has no cause of action, the defendant may surely avail himself of the fact; and so he may if the plaintiff defeats his own title by his own proof. If the estate was never sold by *Brimmer* the executor, and the legal estate now remains in his heirs, the demandants may commence an action in the name of those heirs, by their consent; or may by proper process seek a remedy against them, should they refuse to convey the legal estate, and thus unite it with the equitable.

Perhaps, however, independent of the reasons hereafter assigned, our statute of limitations, might be considered as furnishing serious objections to the suggested course of proceeding by a new action. But, waiving all ideas on that point, at present, the demandants, on the facts before us, appear not to have the legal estate; and it also appears, by their own shewing, that their father never had it; and therefore it is clear that the verdict is wrong and must be set aside.

Here we might close, and leave the parties to the expensive consequences of a new trial, without any intimation of our opinion on some other points of the cause. But as several questions would again arise and be presented for decision, which have already been reserved and argued, and are now before us, on the report of the judge, we have concluded to decide them at this time. We may thus prevent any further delay, and shew the parties that a new trial would be unavailing to the demandants, even if they should distinctly prove that *George Innman* was alive when his father died ; or should have permission to amend by counting on the seisin of *Ralph Innman*, instead of *George Innman*, and shaping their demand accordingly ; and having done either of these, should on another trial, withdraw, or rather, not offer in evidence the will, and should thus be able to obviate all objections arising from the devise of the premises demanded, in trust, which we have been considering. We accordingly proceed to the investigation of some other parts of the demandants' title, and examine some other objections on which the counsel for the tenant has placed reliance. We pass over that which relates to the proof of pedigree; and also that which regards the manner in which the deeds from the committee were signed and executed; as well as some others; because their determination is not necessary; and because we think most, if not all of them are unfounded. We are also strongly inclined to the opinion, that the want of certain recitals in the deeds, which have been mentioned in the argument, furnishes no objection to their correctness and validity, or to the propriety of presuming certain facts, though not recited. We do not think that the cases cited as to officer's returns are applicable. Officers are

under oath, and their returns are legal proof of the facts they certify, and if they are defective, parol proof cannot be admitted to supply deficiencies.    But no law requires an executor, administrator, guardian or collector of taxes to set forth in their deeds all the anterior facts, as to their authority and proceedings; they need only state the capacity in which they profess to act ; for if they do state all the particulars, such recitals would not be proof, as we have decided in *Harlow v. Pike* 3 *Greenl.* 438. The facts recited must all be proved on trial; unless in those cases where, from lapse of time or some peculiar circumstance or misfortune, they may be presumed.    As to the supposed impropriety of presuming facts not recited, the above answer seems sufficient.    But as the law has prescribed what steps were to be taken in making sales for nonpayment of taxes, the presumption, especially after the lapse of fifty years and loss of all records, is, that such proceedings were had and such steps taken by all concerned; unless, upon examination, the contrary should appear to be the case.

This leads us to the particular examination of the acts of 1753 and 1762, and the proceedings under one or the other of them in relation to the sales of the premises demanded; because if those sales were valid, their validity must depend on their having been pursuant to the directions and provisions of one of those statutes. According to the argument, it seemed doubtful which was the one; or whether the act of 1762 had repealed that of 1753.    We will first examine the sale and test it by the act of 1753, considering it, for the present purpose, as not repealed by the act of 1762.  In the second section it is provided thus—" And every such " proprietor as shall neglect to pay to the collector or treasurer " or committee of such propriety, such sum or sums of money, " as shall from time to time be duly granted and voted to be " raised and levied upon his right and share in such lands, for the " space of six months, to those who live in the province, and twelve " months to those who live out of the province, after such grant " and his proportion thereof shall be published in the several " public prints as aforesaid, then the committee of the proprie- " tors of such common lands, or the major part of such committee

Innman & als. *v.* Jackson.

" may and are hereby fully empowered from time to time, at " public vendue, to sell and convey away so much of such delin- " quent proprietors' right or share in said common lands, as will " be sufficient to pay and satisfy his tax or proportion of such " grant, and all reasonable charges attending such sale, to any " person that will give most for the same ; notice of such sale " being given in the said prints, forty days at least beforehand," and may give deeds, &c. &c. The common lands referred to in the above section, it would seem, must be lands which have been actually located, and the proprietors of which have incorporated themselves according to law. This appears from other parts of the act. The first section, speaking of the mode by which an original incorporation is to be effected, and subsequent meetings called, directs that application may be made to any justice of the peace through the province, or any justice of the peace for the county wherein " such their lands as aforesaid lie." In this stage of the investigation, it may be useful to inquire into the legal character of an indefinite grant of a tract, or rather quantity of land, as for instance, a township, to be laid out by the grantees, and a plan thereof to be returned for acceptance. In what situation is the land, and what are the rights, which are vested in the grantees prior to such location, ? If a man grants twenty acres, parcel of his manor, without any other description of them ; yet the grant is not void ; for an acre is a thing certain, and the situation may be reduced to certainty by the election of the grantee. *Keilw.* 84. *2 Co.* 36. So if one being seised of a great waste, grants the moiety of a yard-land lying in the waste, without ascertaining what part, or the special name of the land, or how bounded ; this may be reduced to certainty by the election of the grantee. *Leon.* 30. *Noy* 29. From these cases it would seem that by the grant, a right of election was conveyed; but that the title to any particular part of the general tract described, must depend on the election afterwards made ; and being reduced to certainty by such election, the title would then vest in the part elected. In the present case the resolve of *June* 11*th,* 1771, granted " a township of the contents " of six miles and one quarter square, to be laid out adjoining to

" some former grant, in the unappropriated land in this province, " to the eastward of *Saco* river ;" with the usual provision that a plan thereof should be returned to the legislature within twelve months. The design of this provision in grants made by the legislature undoubtedly was, that by a return of such location and plan, they, or the agents on the part of the province or commonwealth, might know how all grants had been located ; and in what places and positions ; so that by such documentary evidence, the future proceedings of the legislature or the public agents might be regulated ; or such locations be confirmed by a subsequent resolve. Whether, after a township has been located under an indefinite grant, a confirming resolve has been usually passed, does not appear ; but it does appear that in the case before us a plan was returned to the legislature, *April* 22, 1772, and the same was then accepted and confirmed. At what time the grantees of a township, or other tract of land, have a right to become a corporation, and act as such, may be a question of some nicety and doubt ; whether they can legally become such until after a location has been made, a plan returned, and a resolve of confirmation passed, in those cases where, by the terms of the original indefinite grant, such plan was required to be returned within a specified period; or whether it may not lawfully be done as soon as the selection and location have been made. It is said that at common law, this is such an act as reduces an uncertain and indefinite grant to perfect certainty, and that thereupon the estate is at once vested and perfect in the land thus located; and that, upon this principle, the grantees may then become incorporated in the manner the statute provides, may assess taxes, and transact all business at their meetings, as legally as they could had there been a confirming resolve prior to their incorporation. Perhaps this is the better opinion, and in unison with that which proprietors under such circumstances have entertained: But on this point it is not necessary for us to deliver or form any definite opinion ; and therefore, on this occasion, we do not mean to be understood as expressing any. The correctness of this conclusion will appear by an examination of some further facts in regard to the resolve of confirmation which was passed in 1773, the

year after the first confirming resolve.  This resolve of *February* 11, 1773, presents a question totally different from either of those before mentioned, and respecting which we have suggested the foregoing queries ; and the decision of this question will shew that the argument of the demandants' counsel, founded on the idea of the retrospective operation and effect of the resolve of confirmation, so as to give a legal existence to the estate of the proprietors in the township, now composing the town of *Paris*, from the time of the first grant, cannot be sustained.   We have already quoted the terms of the original grant from the resolve of *June* 11, 1771.   By the before mentioned resolve of *February* 11, 1773, or confirmation, as it is called in the report, it appears, as has been before intimated, that a plan was returned to the legislature *April* 22, 1772, (taken under and pursuant to the requirement of the resolve of *June* 11, 1771,) which was then accepted and confirmed.   But it further appears that the grantees were afterwards dissatisfied with the location which had been made and confirmed, as above stated, on account of some important mistakes which had been committed ; and for some other reasons ; and that they accordingly applied to the legislature at their session in 1773 ; and for the reasons above mentioned, which they set forth in their application, prayed that the legislature would disannul the former plan, and confirm and establish said township agreeably to a plan annexed to their petition ; whereby the location, form, and position of the tract or township were essentially changed.   And the legislature, thereupon, on the same 11th of *February*, 1773, by the resolve of the date beforenamed, did declare the said former plan to be null and void; and by the same resolve, accepted and confirmed the latter plan, and the lands thereby represented, to the said grantees, in lieu of the land contained in the plan disannulled.   This brief history of the proceedings of the grantees and of the legislature, shews most clearly that until the last resolve was passed, the grantees never had any legal title to the tract of land then confirmed to them ; which tract, the report states, includes within its boundaries what is now the town of *Paris*.   Until this last resolve was passed, the former location and plan were the

basis and evidence of the grantees' title to a particular tract of land, which, however, was a different tract from the one to which they now have title. This resolve, predicated on the consent of the grantees, and passed on their express application, operated as an exchange of one tract of land for another, more acceptable to them, and more convenient to the public. This exchange operated at once as an abandonment of all proprietary proceedings under the first resolve of confirmation. The basis being removed, the superstructure of course fell. Authorities and arguments cannot be necessary to shew, for instance, that the proprietors of a tract of land adjoining the east side of *Penobscot* river, having exchanged it for a tract adjoining the west side of the same river ; cannot, after the exchange of lands, go on with their proprietary records and proceedings relative to the tract on the east side, as applicable to, and in fact, a part of the records and proceedings relating to the tract on the west side; so that the former shall be legally considered as a continuation of the latter. No principle of law would justify this.

From these facts and principles, it seems manifest that the grantees, and their heirs and assigns, could not legally become the incorporated proprietors of the tract of land, now composing the territory of the town of *Paris*, until the legal title was conveyed and confirmed to them by the resolve of *Feb.* 11th, 1773. It appears that the deeds from the committee bear date *August* 5th, 1773 ;—less than six months next after the date of the resolve of exchange and confirmation. Now, unless the assessment was made prior to the confirmation, there was not sufficient time even to advertise the amount of the delinquent's assessment for six months, which was the shortest term allowed in any case. But even forty days more ought to be allowed, on a fair construction, for publishing the notice of the intended sale. However, it is not important to inquire and decide whether the forty days are to be considered as a part of the six months, or additional to them. In either case, the sale was irregular and void. In this view of the subject, it becomes a question of no consequence in the decision of the cause, whether the act of 1753 was or was not repealed by the act of 1762.

Inman & als. *v.* Jackson.

It now remains for us to inquire whether the sale was made in pursuance of the provisions and directions of the act of 1762.

Upon looking into them it appears that there was time for the assessment to have been made and the requisite notifications to have been published, after the 11th of *February*, 1773, which is the date of the final confirmation, and before the 5th day of *August*, 1773, which is the date of the deeds from the committee. The act requires notices which would occupy only five months ; but the fatal objection to this sale, if under the act of 1762, is founded on the following provision, namely : " And if any delin-" quent proprietors do not by that time" (the end of three months' notice) " pay such rates or assessments and charges ; " then and in that case, it shall and may be lawful for the asses-" sors, at a public vendue, to sell and execute absolute deeds in " the law for the conveyance of such lands of the proprietors, to " the person or persons who shall give most for the same ; which " deeds shall be good and valid, to all intents and purposes in the " law, for conveying such estates to the grantees, their heirs and " assigns forever."

Now, the said *Sheppard*, *Brown*, and *Biscoe*, who made and executed the two deeds in question, were not assessors ; they did not pretend to be or to act as such ; in both deeds they describe themselves as a committee, appointed by the proprietors to make sale of the lands of delinquent proprietors. The statute appoints the assessors to sell and to execute deeds; of course, the proprietors could not repeal this provision, and give the power to a committee. It is a special mode of divesting a proprietor of his property ; and the power must be strictly pursued, and the proceedings be strictly construed.

In addition to the foregoing objection to the regularity of the sale, if made under the act of 1762, there is another, equally fatal. For admitting that there was time between the date of the final confirmation on the 10th day of *Feb.* 1773, and the day of sale, for publishing notice of the amount of assessments for sixty days, and afterwards advertising the intended sale three months before the sale, as the above act required ; still, within that period, there was not sufficient time for calling a proprietors'

meeting, and making the assessment subsequent to the final confirmation. For the first section of the act of 1753 required that forty days' notice should be given of a proprietors' meeting. So that more than six months would be necessarily consumed in legally calling a meeting, assessing a tax, and giving the requisite notices of amount of assessments, and the intended sale of delinquents' property. This same objection applies also with the same force, if the sale was made under the act of 1753. This consequence necessarily follows from the established fact, that until the final resolve of confirmation was passed, the proprietors had not acquired a title to the township, now *Paris* ; and from the established principle, that until such acquisition of title, they could not legally commence proceedings for the purpose of incorporating themselves, or perform any acts as a corporation.

In this view of the subject, respecting the conveyances, it becomes unnecessary to examine into the alleged distinction between the acts of 1753, and 1762, as to the objects of assessment; and whether the former related to assessments on the several rights ; and the latter to assessments on the whole property ; because we find on examination, that whether the assessments were on the one or the other, the sales were not made pursuant to either of those statutes.

Thus, it is perceived, that notwithstanding the antiquity of the transactions which we have been considering and investigating, and the greatest degree of legal indulgence to the influence and effect of presumptive evidence ; the facts which are clear and undisputed, when compared with the law of the land then in force, completely control and destroy all the anticipated benefits of the presumption. *Stabitur presumptioni, donec in contrarium probetur.*

From this investigation, it will be perceived that the further prosecution of the cause will be unavailing to the demandants ; but we can only set aside the verdict, and grant a new trial.